Good morning. May it please the Court, my name is Betsy Bridge and I am the Attorney for Northwest Requirements Utilities. Today I will present argument on behalf of all petitioners. I'd like to reserve a few minutes for rebuttal. Because this is a case of enforced impression, I would like to begin by addressing the limits of FERC's jurisdiction under Section 211A of the Federal Power Act. The purpose of Bonneville's Environmental Redispatch Policy is to save endangered fish at dams. It is a generation policy. And the plain language of Section 211A grants FERC jurisdiction only over the transmission services of unregulated utilities. And as this provision is unambiguous, FERC does not get Chevron deference. If FERC lacks authority under the Federal Power Act, its action is plainly contrary to law and cannot stand. As I understand it in this case, basically what FERC said was you have to serve the wind generators, correct? Yes. You admit that's within FERC's power? For transmission services. Transmission services, right. You have to provide, hook them up to your transmission, correct? Yes, 211A allows FERC to order an unregulated utility to provide comparable transmission services. Okay, so what in FERC's order would pass FERC's legal authority? Bonneville's policy is a generation policy. All of the actions that Bonneville took under the Environmental Redispatch. You may be complaining about what Bonneville did, but they're not a part of this case, right? No, they are not. So tell me what FERC did that was inappropriate. FERC exerted its jurisdiction over a policy that is a generation policy. Right, and FERC said to Bonneville, Bonneville, you must carry power from the wind generators, correct? That was their order. They said you must carry power from the wind generators. You must attach them to your system and charge them the same amounts that you charge other users of the system. That was the FERC order, was it not? The FERC order, what FERC did, it told Bonneville it could not continue to implement its Environmental Redispatch policy. Right, what it said to Bonneville was you cannot refuse to carry power generated by the wind generators at a time when you carry your own power on your transmission lines. That was the FERC order, was it not? The FERC order. Bonneville responded to the order as a separate question. My question is, what was the FERC order? The FERC order found that Bonneville's. Bonneville had a practice during, we all understand the facts. Bonneville had a practice during times of oversupply of not carrying power generated by other folks in favor of its own power, and FERC said no, that policy violates the statute because the statute requires you to carry power of all folks without discrimination. I can get into the exact language of the order, but that's what FERC said, right? That was what FERC said, but the statute says that it can only order, it can only order an unregulated utility to provide comparable transmission services. And Bonneville was providing comparable transmission services. Let me just stop here because this is at the center of your case. It wasn't providing comparable transmission services to Bonneville's own power, was it? In other words, during times of oversupply, Bonneville was saying we will continue to transmit our own power on these lines, but we won't transmit your power, wind generators. It continued to reach the transmission schedules of the wind generators and make power deliveries under the environmental redispatch policy. We may be quibbling over words here, and I want to make sure we're not. Bonneville's initial policy was that during times of oversupply, we're not going to carry, we're not going to transmit your power on our lines the same way we transmit our own power, right? Yes. Okay. So there was a differential treatment to Bonneville's own power and to wind power generators' power in terms of transmission, correct? Yes, and not in terms of transmission. Transmission was not implicated under the environmental redispatch policy. It was, to your point, it was actions taken at generating facilities, whether it was at the wind generators generating facility or at the dams. It did not involve, it was not transmission service, and that is the important distinction under Section 211A. It was a refusal by Bonneville to allow transmission by the wind generators during this period, and of course that did have a consequence as to generation because they couldn't generate, but it was a refusal to transmit their power. It was a refusal to allow them to generate when they still transmitted power. But not the power from the wind generators because they said we will not transmit your power during this period of oversupply. And therefore the wind generators shut themselves down. It didn't generate the power, right? I mean, step aside for a second from your ultimate position, which is trying to set up a factual predicate here. The factual predicate is that this dispute originally arose because Bonneville said to wind generators during times of oversupply, for all the reasons that the brief set out very well, we can't have too much power on the system and therefore we won't take yours. And FERC said, no, no, you can't do that. You've got to take theirs. I'm having difficulty seeing where FERC went past its authority, which only dealt with transmission. FERC didn't make any orders to Bonneville about generation. It just said you have to take theirs. It may have been an actual consequence that generation was affected, but where in FERC's orders is generation mentioned? Well, the important thing is to look at the actual, the true nature of the actions at issue. Just because FERC labels this transmission doesn't make it transmission. The actions were still taken at generating resources. On FERC's order? On FERC, under Bonneville's ER policy, it took, the actions, once again, they took place at the generating resources. Right. We understand the natural consequence. Yeah, but FERC has said that it affects the ability of wind generators or their transmission. But affects is an extremely broad interpretation, and it has no limiting principle. If you ever took that to our mission. I don't want you to leave this point. It's important to me. FERC's order essentially was you cannot discriminate against wind generators during times of oversupply. You must treat their generated power the same way you treat your own. Right? Yes. You must transmit it the same way you transmit your own. That order seems to me to be squarely within what 211 talks about, which is non-discrimination against other folks. Why does that exceed the power of FERC? Because it renders the limiting words of the statute, transmission services, meaningless. In a case that the petitioners brought to the court's attention in a supplemental authority letter on September 9th, 2014, Electric Power Supply Association v. FERC, which I will note the Supreme Court did grant cert yesterday. But this case, the logic applies here. FERC advanced precisely the same argument. FERC argued that it had jurisdiction over demand response under Sections 205 and 206 of the Federal Power Act because demand response affected the wholesale market. This is not a case where FERC actually regulated demand response. Yes, it created a rule. A rule that dealt with demand response. Yes. And here they created a rule that dealt with transmission. But if you look at the underlying actions, they take place at generating resources. Transmission schedules were still met. Power deliveries were still made. Virtually any action that an unregulated utility takes at a facility that generates electricity affects transmission. The entire power system is meant to generate power at a generating facility and deliver it to the consumer. Any number of actions along the way affect transmission. All of it affects transmission. There are several other issues in the case. One of them might be whether there is statutory standing for your client. Would you address that question? Yes, I would be happy to. Petitioners do have standing. There's been two recent cases out of this court, ICMU v. BPA and APAC v. BPA, that demonstrate that the form of higher rights is an injury in fact. I'm not interested in Article III standing. I'm interested in statutory standing. Do you have standing to sue under the particular statute here? Oh, prudential standing. Well, I don't know. It's now statutory under Lexmark, but it's what you call prudential. In fact, it was always statutory standing before Lexmark, but after Lexmark it's clearly so. So I'm interested in whether you have standing under the statute. I'm quite convinced you have Article III standing. Yes, we do have. Why is the statute designed to protect you? The statute seems designed to protect transmitters, not customers. Well, we are both. We purchase transmission and power services from Bonneville, and many of the petitioners and petitioners' members are also transmission customers of Bonneville. But you're not claiming that you're being discriminated against in terms of Bonneville taking your transmission? No. This is a statute that's meant to prevent discrimination against generators in terms of Bonneville and other people carrying transmission. So why are you in the zone of interest, as the Supreme Court says, protected by the statute? Well, I mean. I'll give you an answer. Yes. And that is you and people like your client are beneficiaries of the statute. That is to say, the reason why the statute is passed is to allow free competition so that the owner of the transmission line can't favor itself, so as to exclude competition. And once you get fair competition in terms of access to the transmission lines, the more efficient producers may sell their power, and that's likely to bring down prices. You, as a consumer, are interested in having a lower price. Is that the answer you want? Thank you, Your Honor. The problem I have with that answer is that in this circumstance, what you're asking for is you're trying to eliminate free access because you want to say that Bonneville can keep these people out. Your Honor, no, this isn't about eliminating free access. Well, no, no, that's exactly what you want because the reason your client is having problems here is to the degree that the wind generators are kept out, and on the facts that we've got here, it cost them about, I think, $50 million because of the power they were not allowed to transmit. Then Bonneville has to compensate. And the degree that they have to compensate, they've got to recover from their consumers, including you. So what you're after here is not free access because of the peculiarity of the system of the federal subsidies that the wind generators are losing. So how do you say, then, that you're a beneficiary under the statute when, in fact, what you want is, in fact, less rather than more access by the wind generators? Your Honor, I don't think, I believe that the wind generators still have access. I don't think that Bonneville's. No, their power deliveries were still met. We're not arguing against open access. Whether you're arguing for or against it, tell me what access interest of your clients was impacted by this decision because this is a statute that's designed to protect access to transmission lines. That's what 2.11 says. So. The answer to that is you say, well, it was designed to protect the consumer. That's why they access. That's a good fact. Yeah, well, it's my problem. Yeah, my problem. The reason I want to ask that question is that Congress often passes laws designed to protect the consumer and they don't. And this may be one of them. So the real question is whether 2.11, whether you have any interests that are implicated directly by 2.11, not the broader question of whether Congress is helping the country. It normally doesn't. So focus on 2.11 for a second. What interests of your client or your clients are impacted by 2.11? Once again, I mean, there are plenty of utilities that are petitioners that have wind generators, one generation that have other generation on Bonneville's system. But they're not, are they complaining about, they're not really complaining about, the flip side of your other argument. Your clients really aren't complaining about transmission on Bonneville's system. You're complaining about the higher rates that result. Yes. Rates that have already been approved by this court. Yes. And so, you see, and this is Judge Fletcher's point. What you're really claiming is that by complying with a federal mandate, Bonneville's going to have to charge us more money. Yes. Right? Yes. And I'm not sure that 2.11 speaks to that issue. That's my difficulty with your statutory standing. 2.11 is the mandate. It may require that you pay more money. That gives you Article III standing. But I'm not sure it gives you statutory standing. So that's one of the things about the difficulty with helping with it. I mean, it comes down to, if we can't challenge this order, then it is, it is, it is, this, these orders are the genesis of what Bonneville had to do to comply with the orders, to implement a different policy. Bonneville could comply with the orders in a different way, could it not? It could, but whether Bonneville has alternatives is irrelevant to this case. I'm not sure it is with respect to statutory standing, is my question. Let's assume you win, and we say FERC, FERC, you know, you can't have this order. Do we know that Bonneville isn't going to just continue with the policy that it came up with? No. Well, the title, wholly apart from the FERC order, it can have that policy, can't it? Yes. So how do we know that your win in this case produces a change in results if you win? Well, I mean, standing, to get standing, you don't have, it's not an absolute, it doesn't need to be an absolute certainty. It's only a substantial likelihood. And Bonneville only began paying compensation to the win generators as a result of these orders. But my problem is Bonneville's not here. Bonneville's not here. And for all I know, Bonneville will say, well, that's fine. FERC is no longer compelling us to do this, but we like it. It's a good policy. It makes you folks pay more. Once again, I mean, it doesn't have to be an absolute certainty, only a substantial likelihood. A substantial likelihood, that's my question. Well, why would an entity, I guess I look at it as a reasonable entity, especially one that is by statute must comport with sound business principles, isn't going to pay compensation if it doesn't have to. I see I'm down to two minutes. I'd like to resume. Okay. Thank you. Good morning, Your Honors. Beth Bissella for FERC. And with me at council table is Paul Gale, and he will argue for the interveners for five minutes. You'll argue what for five minutes? For the interveners for five minutes. Thank you. I'll start off with redressability, if that's all right with the court. I think it's pretty clear on this record that the standard has not been met. It has to be substantially likely that if this court were to reverse FERC's orders here, that Bonneville would go back to a policy that it had for one year. This isn't anything like the Bennett case, where there was a longstanding policy throughout the 20th century of how things were done, and they only changed. Redressability, are you talking Article III standing? I'm talking Article III standing redressability. That's just where I'm starting, Your Honor, although I really think that your point about trying to eliminate open access isn't within the zone of interest in the statute. I don't see that you're losing Article III. Because we stopped on redressability. Let me, if I may, just point out three reasons why. Bonneville has, as this record shows, Bonneville no longer believes its curtailment policy does not involve transmission service. It understands that it involves transmission service. And it also used to believe that providing compensation for curtailing customers would be inappropriate under its other statutes. But it no longer believes that. Bonneville, in its first compliance filing at, for example, FERC ER 46, 61, 65 to 66, and 44, makes clear that it understands its transmission and that it can compensate. I believe an understanding is strongly influenced by FERC. I don't think that that's true, Your Honor, because it withdrew its petition. And this is one of those rare circumstances where you can't Well, it withdrew its petition because it ended up with an acceptable arrangement, given the fact that FERC was issuing orders. But is there any indication in the absence of the order that Bonneville would have undertaken this policy? I'm not arguing at this moment traceability. And so that is something. I don't know that they've met that. But I think that this is a stronger problem, which is why I started there. It's not a longstanding policy, which is why I think that this is different than other cases where redressability might be met. They have no incentive to go back and go back to a one-year policy that they had. They have a strong incentive. You would just leave them alone because what they originally did benefited them greatly. And if they can continue to do it, I'm sure they would. I don't know that it benefited Bonneville one way or another. Of course it did. They shut it all back under the generators. They did not have to allow them in there at all. They didn't have to pay them any compensation. It was a great deal for Bonneville. And you told them they couldn't do it. And you might have been right to tell them they couldn't do it. But it was greatly to their advantage. And now they've said, okay, you win. I don't want to waste my time on this because you're obviously not enthused with what I'm saying. I'll just say my final point on that is that they've now had an extensive rate case. They now understand specifically that they can do this. They're interested to do that. Okay. So I'm going to move on to authority. And I'm going to just point out first that commission had three bases for why this was transmission. And. Can you address statutory standard? Oh. Article three. Sure. I think your honors are absolutely right. Who have questions, I didn't give an answer. Oh, I'm sorry. I think your point. You're supposed to say we're absolutely right. No, my point was you're absolutely right that the purpose of this provision of 211A is to provide open access to nondiscriminatory service. That is, this particular provision is what they have to be within the zone of interest of. And so their action to prevent open access, which is what's occurred here, and to have a nondiscriminatory service. But let me ask it a different way. But isn't the purpose of the statute, if we see it in general terms, to protect consumers? Yes. And because. Other consumers. Sure. Sure. And that's why I hadn't raised this originally. But I didn't think about it in this more specific sense. Which is what we're really dealing with here is 211A, not just the broader statute. And so I think that because. The open access provision is designed to protect consumers. The open access provision is designed to provide open access. Which means open and fair competition, which protects consumers. Under pure economic theory. Now, there's peculiarity in this case, of course, because of the federal subsidies that the generators lose. Right. And so I think the point is to allow this provision to be used to prevent open access, which is what occurred here. It's certainly not what Congress intended. And ironically, all the legislative history that was submitted. Can I ask you to address the eventual order in the case? Or the eventual decision in the case, I'm sorry. Did the hearing officer deal with their argument about this is unduly discriminatory? In other words, there's an argument that they made. They made two arguments, as I take it. One is the doomsday argument. Which in the rehearing order, I think the agency dealt with. When they said, no, no, you don't have to have a doomsday. Because Bonneville's now come to us with a plan that doesn't. And it works. They complete all of their statutory obligations. That was treated. I don't have any difficulty with that. But what about the argument that the policy, the original policy didn't unduly discriminate. Because when generators caused the problem themselves with the whole system. I don't find that argument dealt with in the order. Okay. And I'll turn to that in a moment. If I could just point out that petitioner's claims regarding, on the last point, regarding transmission, whether it's transmission service, they did not address the commission's findings for that in their brief. And it's waived. And the commission made its three bases that it involves interconnection, generators' right to inject its output, and point-to-point transmission service are all stopped based upon that policy. So that really isn't before the court, whether the commission had authority. But they did argue that there was an argument that the original policy didn't unduly discriminate. Right. That's right. Or the bad guys. They caused the problem. And I didn't see the agency deal with it. The commission addressed that, for example, in the first order, the order granted petition at petitioner's excerpts of record 27 to 28, paragraph 62 to 65. And the first for hearing order, petitioner's excerpts of record 57 to 59, paragraphs 46 to 51. And also in paragraphs. I'm looking at it right now. So tell me how it addressed that. What the commission said was, first of all, it said what it based its decision on was that they're all firm customers. So firm customers have a right, whenever they request service, to get it. They can demand service and get it. So that was the commission's basis. The commission said, we don't have to consider the idea that Bonneville can't meet all statutory obligations because it's not true. You gave us two separate ERs. Oh, I'm sorry. You know, I wrote in my notes, in the first for hearing order, petitioner ER 58 to 59, paragraphs 49 to 50, especially at 47. It's the second ER that you mentioned. It's the second ER, yes. Okay. What the commission said there was, Your Honors. What paragraph? Paragraphs 49 and 50, it's a combination of the two. The commission said, as Bonneville has acknowledged, Bonneville doesn't need to contain a firm transmission service of non-hydrocarb customers without compensation to comply with its other statutory obligations. But that's the other statute. That's the doomsday argument. That's the argument that fish will die and water will flow. My question is, they made a separate argument, which is, look, one reason we shouldn't have to pay compensation to wind generators is they cause the problem. They're different than everybody else. They cause the problem because they're operating on this federal subsidy system, and they generate power all the time where our other customers can turn it on and off. And so, we ought to be able to treat them differently. After all, the statute says no new discrimination. And so, we're duly discriminating. Bonneville no longer, as the commission pointed out, Bonneville no longer believes that. Right. Assuming that they're standing, however, the other folks are making that argument in effect. Tell me where the commission disposed of it. It may be that the commission didn't need to dispose of the argument. I just don't see any place where the commission disposed of it. But Bonneville, but the commission did address that. In that same place, it cited to FERC ER 65, I believe it is. And what Bonneville said there is, for example, FERC ER 61, reasonable arguments have been made. This was before the commission. I'm sorry. I'm sorry. I'm sorry. In FERC ER 61. Okay, I'm there. Where the commission, they say reasonable arguments have been made. Okay. And where are you on ER 61? And if it takes us a little bit of time, it takes us a little bit of time. And I think I'm asking how George Fletcher gets involved. I can't find where that particular argument is dealt with. And, again, what the commission said was, let me show you where it is on FERC ER 61. The commission says it cites to FERC ER 61. Oh, I'm sorry. I have the wrong thing. FERC ER 61. This is the commission. I apologize, Your Honor. I'm still on my back. FERC ER 61. In. I wish I had highlighted this page. I apologize. It's page 60, Your Honors. I apologize. It's the last, the first sentence of the last paragraph. Paragraph 54. Okay. So what's it say? I'm not looking at FERC's order, Your Honor. I'm sorry. I'm looking at the FERC excerpts of record. Oh, I'm sorry. I'm showing you that in the first compliance filing, which was before the commission when it issued the first pre-hearing order, it knew already that Bonneville no longer believed that the wind generators were solely responsible for causing the costs involved in the oversupply. So their point was reasonable arguments have been made that both federal hydro resources and wind resources contribute to the oversupply problem and the costs associated with negative pricing. So Bonneville no longer believed that the cost allocation was appropriate, that only the wind generators should face any costs regarding oversupply management. Assuming that they're standing here and that's a large amount of money.  So I don't find the commission's order ever saying that  I don't find the commission's order ever saying that there's undue discrimination. So what the commission said, again, as I was just pointing out in. Is that Bonneville no longer makes that argument. Right. Bonneville no longer makes that argument. Why would the commission consider a factor that Bonneville no longer believe was true, Your Honor? So that's going to be in petitioner excerpts of record 58 to 59. And I'm going to, I wrote especially 49. Okay. So the commission says. It says. Petitioner excerpts of record 58 in paragraph 47, the very last sentence. The commission says these alleged factual distinctions are immaterial to our determinations here. And then if you go to paragraph 49, the commission says in the second, in the, on the fourth line, Bonneville and others essentially claim Bonneville had no options, but to interrupt the firm transmission reservation without compensation. And then in paragraph 50 on the fourth line, the commission says Bonneville now acknowledges in its March compliance filing, it believes there are other lawful options for addressing over generation other than curtailment without compensation. And I guess my difficulty is I don't find any of those directly responsive or nor do I find the abandonment of the argument that, that we, it is doesn't violate two 11 to treat these people differently than ourselves. That was the, the central argument in this case was look, we're entitled to treat them differently than us because they're different. No longer believe that you're on. That's the point. And so when the commission, the commission does regularly considers additional factors. Bonneville is not now claiming that there aren't other ways to do this, but does it also say Bonneville is not now claiming that it would be a legal defense to their prior policy? In other words, it's one thing for Bonneville to say, look, I can do this without the world coming to an end. But Bonneville saying, but I don't have to. No, but that's why I pointed you to the statement in FERC ER 61, where Bonneville understands now that both federal hydro resources and it went on in its cost allocation record of decision. That's before this court in the OS 14 case to say, this is transmission. And these costs should be allocated to all transmission customers using the system during oversupply periods, because they all cause the costs. Okay. I think I'm now finally there. And I think I can help along the argument you're making. If I look at the second to the last sentence of paragraph 50, which is right after you read to us, Bonneville contends that his new proposal to compensate curtailed generation and strike an appropriate balance that would enable Bonneville to comply with the commission's December order, while also satisfying his other statutory obligations. And the complaint against FERC is that it should have addressed the argument. And therefore it is deficient. I think it's an appropriate defense for FERC to make. Well, no party before us was asking us to answer that argument. The only party for us for whom that argument could have been made was Bonneville. That's right, Your Honor. And for us now to fault FERC for not addressing an argument not made by the parties before it. That's right, Your Honor. This is a little more than I think FERC is probably required to do. That's right. Was that argument part of the rehearing proceedings? They did argue to the commission on rehearing that you should consider these additional factors. And I think that if Bonneville, I'm sure, that if Bonneville had not come in in its first compliance filing and said, we see things differently, we can now satisfy all of our statutory obligations and we understand that, then the commission would have considered those factors and would have then stepped aside. And I would say also that the commission did really consider what was, what needed to be done here. I mean the commission didn't insist that the transmission go forward, that wind be allowed on the system. They just made sure that things were handled in a non-discriminatory way. The commission understood that Bonneville needs to substitute at certain times hydropower for the wind power. But it ensured that it was done in a way that could satisfy, as Bonneville said, all of the statutory obligations. See, and I guess where I'm still stuck here may not make a difference, is that I thought after the compliance order, Bonneville came to the commission in addition for a hearing and said, we have some problems with this order and this is one of them. We want to be able to treat these guys differently. And sure, the commission dealt with a lot of things, but it didn't really deal with that. And that is originally was Bonneville's point. And Bonneville then changed its view once, you know, before the commission issued this 211A order, Bonneville didn't have an obligation under 211A. So it wasn't until the commission said, you have an obligation under 211A to provide this open access service and to provide this non-discriminatory service. And so Bonneville then went back and then considered, oh, we have that obligation too. With that obligation, can we balance this? So it wasn't until they really were forced to go and do that, they realized now it works fine. So that's. Let me ask the question specifically, because I'm still not sure I know the answer. In petitioning for rehearing, did Bonneville raise the argument that I just talked about? In its original petition, they didn't file a brief. No, well, there's a order on rehearing where Bonneville says, after the compliance order, we still have some problems. My guess is they did as a matter of preserving their rights at that time. But at the same time, the commission looked at the record and the first compliance filing, which said we can satisfy all of our statutory obligations and provide this compensation. And we think that that satisfies 211A, and the commission agreed. So the commission didn't need to look at facts that Bonneville no longer believed were true, that it needed to not compensate these wind generators in order to provide this service and satisfy all of its other statutory obligations. Even if it asserted to begin seeking rehearing? Yeah, because it asserted. The commission looked at the record. Yeah, exactly. Or were they treated? It's like Bonneville, you have to raise things on rehearing in order to be able to preserve them, and maybe it was all happening at the same time. But the record supports this. It's Bonneville's own compliance policy. This satisfies all of our statutory responsibilities. This isn't a problem. I know, I'm sorry. Thank you very much, I appreciate it. Thank you. Maybe I should say you took the mic. Please accord Paul Gale on behalf of Everett Rural Renewables. I was actually going to address constitutional standing, but I infer that the panel is not interested in hearing that. So perhaps... I speak only for myself. I'm sorry? I speak only for myself. I have heard that at home that they are interested. I don't know what comments I want to make. Well, perhaps I can just give our take on 211A and maybe briefly address constitutional standing. As we read 211A, and it's, I think, refreshingly straightforward, it gives all transmission customers the ability to ask for a FERC order granting nondiscriminatory transmission access, including such access, granting such access to the wind generators. It has nothing to do with generation. It protects all consumers and not just BPA's consumers or AVA's consumers. And so that's how we view 211A, and we don't see any even close context in terms of the zone of interest that if the publics argue that they satisfy the prudential or statutory standing argument, then they are wishing for too much. It's almost be careful what you wish for, because by making the argument they're making, they're saying that it gives the wind generators, it would unduly discriminate against the wind generators. But the point I wanted to make about the standing argument in terms of a constitutional argument is that the three FERC orders that are under review by this court do not increase any rate payable by the petitioners. Or do they necessarily increase? No. They require Bonneville to pay money. The amount of money, I think, is in the right. $50 million or so. They require Bonneville to pay money. But when Bonneville pays money, it's to its rate base. I understand it's not a regulated utility, but it's supposed to. It has a statutory obligation to be self-supporting. Correct. Where does it get the money that it supports itself? Well, the record before FERC contains several examples. For example, Bonneville is engaged in transactions such as power swaps or the sale of surplus power to parties outside of the Balancing Authority Act. In fact, that may even create income for Bonneville. And if they chose a methodology that increased costs, as they may do, the recovery of those costs may not be through the rates that Bonneville charged the petitioners because they have many other different customer groups other than petitioners who receive different services, and the rates increases can come from those customers. But is there a reasonable likelihood that it's not true? I mean, that's all we need for purposes of this case because, after all, the scheme had not yet taken place when it was litigated, so they couldn't demonstrate that their rates had gone up. All we need is a reasonable likelihood for standing purposes. If that were relevant, isn't it a reasonable likelihood that their rates would go up enough? And a reasonable likelihood is in the eye of the beholder, but, for example, $50 million is real money. Well, they have reserves. They've used those reserves in the past. I think the point that I would like to make is that they're here on the wrong orders. You see, they've got various ways they can charge other customers. They've got reserves, and so I understand all of that, but let's take the number of $50 million as if that were the proper number. It may be a little more or a little less. But Bonneville, because of this, has now incurred costs of $50 million that would not otherwise have incurred. That goes into their rate base, and they're going to figure out some way to deal with that. Now, if it had not gone into their rate base, they have an obligation to supply cheap power, which means that their rates would have gone down as compared to what they would once they got the $50 million in their rate base. So your only argument, I think, is, well, they might have charged from different customers. Different customers? Financing, reserves, perhaps? No, no, wait a minute. Financing, reserves, that's... No, they've got $50 million to account for that they otherwise didn't have to account for. Where's it going to come from? The only place it's going to come from is going to be from the people who pay money to them. So the question is, who are they going to charge? And I suspect if some other customer from another category came in, you'd say, in this same posture, you'd say, well, they could be charging somebody else. So the only answer to your argument would be for every possible category customer to come in here and join this plant as expetitioners, which I think is probably more than could be required under Article III. I think that the most overarching point is that they are appealing the wrong order. I think we started out this oral argument. Why are we here today? There's now a new protocol in place. If they have a beef with the rate increases, it wasn't FERC's order that mandated the rate increases, which distinguishes all of the cases that they cited. It is the subsequent Bonningville implement orders, OS-14, the oversupply management, that have caused the rate increases. If they have a beef with the rate increases, those are the orders that should... generated by those orders, that should be the subject of their appeal, not a FERC order that doesn't direct any financial increases. Thank you. Thank you, Your Honor. I would like to hit four quick points. On the issue of statutory standing, I would refer you to the Central Arizona VEPA case that we cited in our brief, where the court held that the interest of customers paying the cost of an agency's action to comply with a particular statute or order are within the zone of interest. And there the court did find that the water districts had statutory standing. What role did your client play in the FERC proceedings? We were interveners and actively litigated, submitted numerous comments and requests for a hearing. And you objected to the requirement that Bonneville pay anything? You mean on the OMP, the Oversupplies Management Protocol, and the oversupply rate. Yes, we have been active participants in litigation and the administrative proceedings at Bonneville and at FERC. And Bonneville never, and FERC never said that you have no right to be here? No. Do you agree that FERC did dispose of the argument that I keep seeing in the briefs, that fish will die and water will flow and the world would be damned if we have to follow this order? Now we now know that if Bonneville has to follow the order, it may result in increased costs to consumers, but fish won't die and the EPA won't come in and stop things. Well, Bonneville's policies are, the two questions before the court today are whether FERC's orders, whether FERC exceeded its jurisdiction under 211A, and whether it provided a rational basis for its similarly situated findings. I'm sorry. Bonneville's, sorry. One of the arguments in your brief, I just want to make sure you're still making it, was that FERC overstepped its bounds because it intruded on the EPA and other statutes that require Bonneville to preserve fish and do things like that. That's not a lot of this case, isn't it? Your Honor, that is what FERC and the intervene artists have argued, but that mischaracterizes the petitioner's argument. Our argument is that FERC failed to take Bonneville's statutory obligations into account as part of its similarly situated analysis. That's why Bonneville's statutes are relevant in this proceeding. FERC said, we acknowledge it, but they dismissed it with a cursory, I quote, it's immaterial. That's a conclusion, it's not a reasoning. That's where Bonneville's statutes come to play in this case. I would also like to go back to Judge Hurwitz's statement regarding Bonneville's preferential treatment of its own resources, and I just want to clarify that Bonneville curtailed its own generation, it's the nuclear plant, before curtailing any of the wind generation. Wind generation was the last generation off of the system, except for the hydro, which, of course, the whole purpose was they couldn't curtail hydro because it would kill fish. So I just wanted to clarify that thermal generation was curtailed before other generation. It was only hydroelectric resources that could not be curtailed before other generation. And also, I would like to just point out once again that Bonneville's policies are not at issue, and to respond to FERC's points that Bonneville's now coming in and saying, oh, well, okay, this is a transmission and we can comply. In the answer of the Bonneville Power Administration, you can see it's Petitioner's EOR 95. In the table of contents, under the titles, it says the commission should not issue a Section 211A order. Bonneville argues environmental re-dispatch does not affect transmission service. Environmental re-dispatch does not violate comparability and is not unduly discriminatory. FERC's orders altered the legal landscape that Bonneville is now subject. So the fact that Bonneville has now come in and said we are complying with these orders does not mean that it did not make those arguments earlier. Thank you. Thank you, Senator. Thank you. Thank both Sessions for your arguments. Northwest Requirements Utilities v. FERC now submitted for decision. Thank both Sessions for all your arguments. That concludes the calendar for this morning, and we are now adjourned. All rise. This morning's session is adjourned.
judges: Walter, Fletcher, Hurwitz